# MEAHER *vs.* COX, BRAINARD & CO.

[BILL IN EQUITY FOR DISSOLUTION AND SETTLEMENT OF PARTNERSHIP.]

1. *When equity will decree dissolution of partnership.*—Although the defendants may not have committed such acts of misconduct, or been guilty of such willful violation of the terms of the contract, as would authorize a court of equity to decree a dissolution of the partnership for that cause; yet a dissolution will be decreed, where it appears that they refuse to carry out one of the terms of the articles of partnership, and insist that, in order to conduct the partnership business successfully, that stipulation must be either changed or disregarded; that they have refused to correspond with the complainants, on matters connected with the partnership business; that the state of feeling between the parties justifies the apprehension, that the joint business can be no longer prosecuted to the mutual advantage of all the partners; that there is no partnership property which might be sacrificed by a sale, and that a dissolution would not probably inflict any material injury on either party.

2. *Jurisdiction of equity, in such case, not affected by stipulation providing for reference to arbitration.*—A stipulation in articles of partnership, providing for a submission to arbitration of all matters of controversy which may arise among the partners, does not take away the jurisdiction of equity to decree a dissolution.

3. *Admission of new partners.*—New members cannot be introduced into an existing partnership, even by a majority of the partners, without the consent of the others; yet, if the others recognize and treat the new members as partners, and continue the business with them under the original articles, this is sufficient to make them partners, and to render the original articles operative as between them.

4. *What constitutes partnership.*—A contract between two steamboat companies, engaged in carrying passengers and freight between Montgomery, Mobile and New Orleans, by which it was stipulated, that each company should furnish a specified number of boats, of which the respective owners should retain the property and assume the risk; that all losses, injuries, and damages, caused to third persons or their property, whether by accident, negligence, want of skill, or other cause, should be borne solely by the owners of the boat causing or sustaining such loss or damage; that the compensation of agents, at specified points, to attend to the joint business, and all losses paid for injuries and damages on cotton shipped from the river above through to New Orleans, should be a charge against the joint fund, and be borne by the parties according to their respective interests; that the proceeds and earnings of each boat, deducting therefrom the running expenses, should be ascertained monthly, and be divided between the parties in proportion to the number of boats furnished by them respectively; that uniform prices should be established, and through

tickets be good on all the boats; and that neither party should be interested in any other boat running on the same route, or make any private contract for his own advantage, which might be injurious to the others,—constitutes the parties partners *inter sese.*

APPEAL from the Chancery Court at Mobile.
Heard before the Hon. M. J. SAFFOLD.

On the 7th July, 1858, Cox, Brainard & Co., (a firm composed of Henry L. Jayne, F. M. Johnson, and W. E. James,) J. M. & T. Meaher, (a firm composed of James M. Meaher and Timothy Meaher,) Byrnes Meaher and Stewart Cayce, all of whom were then engaged in running steamboats on the Alabama river, carrying passengers and freight between Montgomery, Mobile and New Orleans, entered into a contract, of which the following is a copy:

"Articles of agreement, made and entered into at Mobile, this 7th July, A. D. 1858, by and between the firm of Cox, Brainard & Co., of the first part, and the firm of J. M. & T. Meaher, Byrnes Meaher and Stewart Cayce, of the second part, all of the city of Mobile, *witness,* that the said parties, each being owners of steamboats employed in carrying freight and passengers to and from Mobile, have agreed to employ and run steamboats in the trade of the Alabama river, and to New Orleans, in concert; each party to furnish, properly equipped and fit for service, at their own cost and expense respectively, a certain number of boats, as agreed between them, and to divide between them, in certain proportions, the net proceeds of their freight, passage-money, and other earnings, as they may accrue, after satisfying their running expenses. Whereupon, to accomplish said object, the said parties have contracted, agreed, and mutually stipulated with each other, as follows:"

(The first three clauses provide, that Cox, Brainard & Co. shall furnish ten, and the other parties two steamboats, which are specified by name, and a particular part of the business allotted to each,—some to run between Mobile and New Orleans, and others between Mobile and Mont-

Meaher v. Cox, Brainard & Co.

gomery; some during the winter season, or high water, and others during the summer season.)

"4. It is further mutually agreed between the parties, that each of them shall, during the continuance of this agreement, constantly keep ready provided, equipped and fit for service, their proportion of boats as hereinafter stipulated, so that they may perform the service required of them; and, in the event of the loss or disabling of any of said boats, they shall be replaced, when wanted, by the proper party, by others fit for the service, as near as may be.

"5. It is also agreed, that the said several boats shall be and remain the property of each of the parties respectively, as heretofore; that they shall continue to be the owners of said boats, and they shall be at the risk of their respective owners in all things. All repairs, such as are usually made by the crews of the boats while in use, causing no delay in the running of the boats, shall be made by their crews respectively; but no delay shall be allowed, to the end that repairs may be made by the crews; and where repairs are needed, they shall be promptly made, by proper workmen, employed and paid by the owners of the respective boats at their own cost and charges, so that no delay shall occur, but that the boats shall be promptly fitted to perform their service; and if any boat be so disabled that the necessary time for repairs would cause the loss of more than one trip, then the proper party shall furnish another boat, capable to perform the service, in the stead of the disabled boat; and if the need of repairs, in any case, shall cause the loss of a trip of any boat, then the expenses of said boat, during the time lost, shall be at the charge of the owner.

"6. All losses, injuries, and damage, either to the vessel, cargo, crew, or passengers, or to third persons, whether caused by accident, negligence, want of skill, or otherwise, shall be at the sole charge of the owner of the boat causing or sustaining the loss; and the other party shall not be chargeable, nor called on, nor be responsible for any such

loss, in any manner, either to the other party, or to third parties; and each party shall answer exclusively for all losses, and bear the same, and each party shall be exclusively responsible for its own officers and servants.

"7. It is furthermore agreed, that the total amount of the proceeds and earnings arising from the use of said steamboats shall be ascertained and divided monthly between the said two parties, and paid over to them respectively—say to Cox, Brainard & Co. four-fifths, and to the said Meahers and Cayce (the said parties of the second part) one-fifth; that correct and full accounts shall be kept by each boat of its receipts and expenditures, and of all its business, and that each party shall account to the other of all its business concerning the subject-matter of this contract; that nothing shall be charged, but the actual expenses of the running department of said boats, exclusive of the repairs, value of the use of the boats, insurance, taxes, &c.; the amount to be divided to be stated by computing the earnings, and deducting therefrom the wages, provisions, wood, supplies, and all daily expenditures properly belonging to the running of the boats for the time being. All bills paid must be filed, and proper vouchers taken, in every instance, for money paid; which, together with the cash and an account thereof, with the books in explanation, shall be returned at the end of every trip, to the respective offices in Mobile of each of the parties, for the examination of the other party; and monthly settlements between the parties shall be made, and divisions of the proceeds, as aforesaid.

"8. It is agreed, that the prices of freight, passage, &c., shall be uniform on all the boats, as fixed by the parties from time to time; and that through tickets shall be good on all the boats; and that no private contracts shall be made by either party, contrary to the meaning and true spirit of this agreement, nor exclusively beneficial to either, nor injurious to either; but both shall, in good faith, so act as to promote the joint advantage, in a spirit of fairness and equality of right.

"9. It is expressly stipulated, that, during the continuance of this contract, neither party shall, under any pretense, run, or be interested, directly or indirectly, in the running of any other boat or boats on the Alabama river, or between Mobile and New Orleans; the profits of all said trade being for the joint account, under this agreement, as herein stipulated.

"10. It is mutually understood, that the salaries or compensation of agents to promote the joint business, at Montgomery, Selma and New Orleans, being for the joint benefit of both parties, shall be allowed as a charge, and paid out of the gross earnings of the boats, as a charge against the joint fund.

"11. It is further understood and agreed, that the days of departure of the boats of the parties of the second part, while this contract lasts, shall be Sundays and Mondays, unless changed and otherwise arranged by the consent of the parties to this contract.

"12. The parties respectively agree, that each shall account to third parties, for all lost freight, and also to each other for the freight money; and that, at the expiration of each year of the duration of this agreement, each party shall assume, as cash, all debts due to each boat respectively, and account for the amounts thereof to the other party, as if collected.

"13. It is furthermore the agreement of the parties, that all questions which may arise, as to the conducting of the business, under this agreement, shall be discussed and settled by consultation, by a committee of two persons, (one of whom shall be named by each party,) who shall determine the same; and each party shall annually nominate a person to act on said committee, and, in case of absence or sickness, each party shall be at liberty to appoint a substitute; and in case of a difference of opinion between them or their substitutes, and disagreements shall arise, then they shall call in a third person, selected by them jointly, who shall determine the point or points to be settled.

"14. It is agreed, that the books of all the boats, and

all accounts, vouchers, and papers, shall be investigated, examined and audited by a committee of two persons, one of whom shall be nominated and selected by each party from time to time, and so often as needed, who shall make up the accounts for division under this contract; and that the books and papers shall, at all times, be subject to the inspection and examination of the said Cox, Brainard & Co., Meahers, and Cayce.

"15. It is further agreed, that in case the parties shall hereafter deem it to be for their mutual advantage and interest to increase the number of steamboats to be used and run on the river or lake, then each party shall furnish boats in the same proportion as under the present stipulations.

"16. It is agreed, that the compensation of the examining and auditing committee, and also all losses paid for injuries and damage on cotton shipped from the river above through to New Orleans, shall be charged to the general expense account, so that the charge shall be borne by the parties according to their respective interests.

"17. This agreement is to commence on the 5th July, 1858, and to continue until the 30th June, 1868, (including both days,) unless either party should conclude to sell out and abandon the business; then the other party shall have the preference and right to purchase the interest so to be sold, at the price and terms which may be offered for the same by others, and at which such party may be willing to sell.

"In witness whereof," &c.

(Signed by each firm, and by each partner individually.)

On the 7th, January, 1860, F. M. Johnson, Robert Otis and Moses Waring, as partners composing the firm of Cox, Brainard & Co., "and as trustees managing the business of said firm," filed their bill in equity against James M. Meaher, Timothy Meaher, Byrnes Meaher, and Stewart Cayce; asking a dissolution of the partnership formed under the articles above copied, and a settlement of the partnership accounts. The complainants alleged, that said

partnership went into operation, under said articles, at the time therein provided; that Henry L. Jayne afterwards died, and William F. James withdrew from the firm of Cox, Brainard & Co.; that on the 1st July, 1859, complainants were appointed trustees to manage the business of Cox, Brainard & Co., and, as the active partners of said firm, were vested with all their rights and interest under the said contract with the defendants, and thenceforward continued to carry on the said partnership jointly with them; that an auditing committee was appointed, as provided in said articles, who stated the accounts of the parties, not for exact periods of one month, as therein provided, ("since that was found inconvenient in practice, as the month would often expire while the boats were on the way,") but for every period of five round trips, which approximated to one month; that this practice was, for convenience' sake, sanctioned and acquiesced in by all parties, and the accounts were thus stated up to the 1st July, 1859, when a balance of $6,981 13 was found due from the defendants to the complainants, which was afterwards settled and paid, but not without considerable delay; that the accounts were afterwards stated by the committee, as before, up to the 9th August, the 15th September, and the 18th October, showing a large balance each time in favor of the complainants; that the defendants refuse to pay these balances, amounting in all to more than $6,300, and insist that they will only settle at the end of each year; that the complainants, after repeated refusals on the part of the defendants, placed their claim in the hands of their attorneys and solicitors, with instructions to demand payment and a performance of the articles of partnership; that said attorneys addressed two letters on the subject to the defendants, to which no reply was returned, and afterwards called on them in person, and notified them, under instructions from the complainants, that, in consequence of their refusal to perform the terms of the contract, the complainants proposed to consider the contract as ended; that the defendants declined to make any answer to this proposition; that the

defendants also claim "that they have the right, under said articles, to give credit for freight, &c., and are not bound to distribute, at the stated periods, anything else than money actually realized, but may retain all other assets until the end of the year, whereas the contract requires the distribution of all proceeds at the monthly periods;" and that, in consequence of these repeated refusals on the part of the defendants to comply with the stipulations of the articles, the partnership can be no longer successfully carried on, and the complainants have a right to insist on its dissolution. Copies of the articles of partnership, the accounts stated by the auditing committee, and the letters addressed by the complainants' solicitors to the defendants, were appended to the bill as exhibits.

The defendants filed a joint answer, admitting the execution of the contract shown by the articles, (but not that said contract constituted a partnership between the parties,) the conducting of the joint business under said contract up to the filing of the bill, the withdrawal of James, the statement of the accounts by the auditing committee, the settlement of the balance found due from the defendants on the 1st of July, 1859, their refusal to pay the balances afterwards found due from them, and their refusal to answer the letters and proposition of the complainants' solicitors. They insisted, that the accounts stated by the auditing committee were only designed to furnish the parties with information as to the condition of the business, and included cash and uncollected debts ; that, under the twelfth article of the contract, they were only bound to assume as cash the uncollected debts at the end of each year, and not at the expiration of each month ; and that "to require from either party monthly payments, including outstanding debts, would not only impose a hardship on the party paying, but would materially interfere with the success of the business itself." They alleged, that the complainants had not carried out the contract in good faith, and had violated its stipulations in several specified particulars ; and justified their own refusal to reply to the communications of the

complainants' solicitors, on the ground that the articles provided a mode of adjusting all controversies, and the complainants had not proposed to settle the matters in dispute in that mode. They also demurred to the bill, for want of equity, and for want of necessary parties.

The complainants having submitted a motion, on bill and answer, for a decretal order, declaring a dissolution of the partnership, and ordering a statement of the accounts by the master, the chancellor rendered the following decree:

SAFFOLD, Ch.—"It is suggested by the defendants, that the contract between the parties does not establish a partnership *inter sese.* In *Smith's Executor v. Garth,* (32 Ala. 368,) it is said : 'To constitute a partnership *inter sese,* there must be a mutuality of risks—an interest both in the profits and losses. These risks or interests are not required to be equal; nor is it important that they shall agree in kind. The investment may be unequal, and the parties may agree to divide the profits unequally ; yet, if it be one of the terms of the contract that each shall share in the risks and losses, and also in the profits to be realized, this constitutes them partners as between themselves.'—See authorities cited. This settles the law of this case upon the point raised. The articles express the agreement to be, 'to divide between them, in certain proportions, the net proceeds of their freight, passage-money, and other earnings, as they may accrue, after satisfying their running expenses.' The fourth and fifth articles provide for a separate ownership of the boats by the parties respectively, and for having them constantly ready and equipped, and against any delay for repairs, &c.; 'and if the need of repairs, in any case, shall cause the loss of a trip of any boat, then the expenses of such boat, during the time lost, shall be at the charge of the owners.' The seventh article provides for a division of the total amount of the proceeds and earnings, in certain proportions ; 'that nothing shall be charged, but the actual expenses of the running department of the said boats, exclusive of the repairs, value of the use of the

14

boats, insurance, taxes, &c.; the amount to be divided to be stated by computing the earnings, and deducting therefrom the wages, provisions, wood, supplies, and all daily expenditures properly belonging to the running of the boats for the time being.' The tenth article provides, that the salaries of the agents shall be paid out of the gross earnings of the boats, as a charge against the joint fund; and the sixteenth article provides, 'that the compensation of the examining and auditing committee, and also all losses paid for injuries and damage on cotton shipped from the river above through to New Orleans, shall be charged to the general expense account, so that the charges shall be borne by the respective parties according to their respective interests.' It is to be gathered from these stipulations, that there is a mutuality of risks—an interest in the losses, to the extent of satisfying the running expenses of the boats, such as wages, provisions, wood, supplies, and all daily expenditures; the salaries of the agents and examining and auditing committee, and losses on cotton shipped through to New Orleans. Should it appear that the legitimate expenses, as above provided for, exceeded the gross earnings of one or more of the boats, and resulted in a loss to such boat, the loss would be a charge against the common fund; and so the parties seemed to consider it in making up their accounts. Suppose that, for a whole year, the legitimate expenses of the running department of the boats of one of the parties had exceeded the gross earnings of said boats, without culpable neglect or misconduct on their part causing that result, and the net profits of the boats of the other party had been considerable; there can be no question, that these profits would have been subject to division between the parties, in the proportions stipulated for; nay more, they would have been subject to a reduction first, to the extent of the losses of the unfortunate boats, and the balance subject to division; and upon the same principle, if all the boats of both parties had sustained losses, by the legitimate expenditures exceeding the gross income, the losses would have to be borne proportionately.

Meaher v. Cox, Brainard & Co.

It is true, that the sixth article stipulates against a mutuality of risks, as to a certain class of losses, injuries, and damages; and it was entirely competent for the parties, as between themselves, to provide against such mutuality of losses, and declare them not to be legitimate charges against the common fund. But, unless these stipulations covered the whole ground of mutuality of risks, the principle of the case above cited establishes a partnership *inter scse.*

"The next question to be considered is, whether the court will decree a dissolution of the partnership, on the case made by the bill and answer. In determining this question, it is proper for the court to look to the duties and obligations implied in the partnership contract, as well as to the express terms of the contract, and to the results of a dissolution to the partners. It is considered, that the defendants have not committed such acts of misconduct, or been guilty of such violation of the terms of the contract, as would authorize the court to decree a dissolution for that cause; nor does it appear, from the bill and answer, that they have willfully violated the contract in any regard; and no acts of the complainants are stated in the answer, which would induce the court, *ex mero motu*, to dissolve the partnership, especially when such dissolution is not assented to by the defendants. This is not a case, however, wherein it appears that any material damage is to result to the interests of either party, or a joint partnership property may be sacrificed by a sale on dissolution; and it is to be considered, that the partnership contract imposes upon both parties mutual good will and confidence, without which it would be impracticable to carry out the agreement beneficially to both parties. Moreover, if a dissolution were not decreed, violations of the contract, and violent and lasting dissensions, would probably result from a continuance of the partnership, engendering litigation and a final necessity for a dissolution. The court is of opinion, that the state of feeling between the parties at present warrants this apprehension, and that a dissolution should be decreed."

The chancellor accordingly decreed a dissolution of the

partnership, and referred the matters of account to the master; and his decree is now assigned as error.

R. H. Smith, for the appellants.—1. The contract between the parties did not create a partnership. There is no common property, and no joint control; no combination of property, labor and skill, for the common profit; no personal responsibility for the debts and engagements of each other, and no power to bind each other by contracts; the property of each is at his own risk, and subject only to his debts; and, on dissolution, there could be no lien for partnership debts.—1 Parsons on Contracts, 124; 3 Kent's Com. (last ed.) 20; *Pattison v. Blanchard*, 1 Selden, 186; *Smith v. Wright*, 5 Sanford, 113; *Hodges v. Dawes & Co.*, 6 Ala. 217. The bill shows that the members composing the firm of Cox, Brainard & Co. have been changed, without the defendants' consent, and without consultation with them; which could not be done in case of a partnership.— Story on Partnership, § 5.

2. Whether considered as a bill for the dissolution of a partnership, or for the rescission of a contract, the complainants are not entitled to any relief, on the case made by the bill and answer. As the hearing was on bill and answer, the answer must be taken as true in all its parts. 4 Ala. 464. The seventh and twelfth articles, construed together, show that, while the accounts are to be adjusted monthly, and the cash balances to be paid over, the uncollected debts are to be assumed and accounted for only at the expiration of each year. If the complainants' construction be correct, the bill itself shows that, in practice, the parties have adopted a different construction; and the court will give effect to such practical construction.—*Boyd v. Mynatt*, 4 Ala. 79; *Smith v. Joyes*, 4 Beavan, 503. Complainants assert a simple legal demand, recoverable at law; and as the balances between the parties are continually shifting, they should be left to their remedies at law.—*Loscombe v. Russell*, 4 Simon, 8. A court of equity will not undertake to adjust the squabbles of partners.— *Wray v.*

*Hutchinson,* 2 My. & K. 235 ; *Henn v.. Walsh,* 2 Edwards' Ch. 129. Particularly ought this rule to be enforced, where the articles provide a mode of adjusting. differences, and the complainants do not show that they have sought that mode of redress.—*Smith v.' Mules,* 10' Eng:. L. & Eq. 103. The complainants show no· right in themselves· to maintain a bill im behalf of Cox, Brainard & Co.—1 Russell, 441. No' cause for a dissolution is shown, im any view of the case.—Story on¹ Partnership, §§ 287–89.

GEO. N. STEWART, and E.. S. DARGAN, *contra.*—1. The' contract contains all the elements of a partnership, not only as to third persons, but us between the parties. Participation in the profits and losses, without regard to the mode of dividing either, constitutes a partnership.—*Smith's Executor v. Garth,* 32 Ala. 368; *Bostwick v. Champion,* 11 Wendell, 571 ; *S. C.,* 18 Wendell, 175.

2. Whether the contract be a partnership· *inter sese,* or only as to third persons, ample cause for· dissolution is shown.— *Waters v. Taylor,* 2 Vesey & B. 303 ; *Loscombe v. Russell,* 4 Simon, 11 ; Gow on¹ Partnership, 124–6, 246–7, 111–6 ; Collyer on Partnership, §§ 291–97, 194–6, 236 ; Story on Partnership, 413–14, 423, 290; 3 Kent's Com. 60.

R. W. WALKER, J.—Whatever may be the proper construction of the 12th clause of the articles, when taken im connection with the 7th, it is admitted on. both sides, that, by the agreement, the accounts are to be adjusted monthly, and the *cash* balances paid over. When the defendants were called on to pay the balances, as stated by the auditors, they did not object to· the accounts, on the ground that they were made up in part of cash, and in part of uncollected debts, without distinguishing the cash from the debts ; nor did they then, nor do they by their answer, express a willingness to pay the cash balances, according to· the stipulation in the articles. On the contrary, the answer must be understood as insisting, that the business of the partnership cannot be successfully conducted,

if the 7th clause of the articles is carried out as it is written; and the unwillingness of the defendants to abide by and execute that term of the agreement, is apparent. If, in adjusting the accounts, and ascertaining the balances to be paid over, the auditors did not proceed in the manner directed by the articles, this fact should have been pointed out, and the proper correction asked by the defendants, when called on for payment by the complainants. But, instead of this, they made no reply to the communications upon the subject sent to them by the complainants; and when applied to with a proposition from the complainants to terminate the partnership, they refused to say whether they would accede to it or not.

Looking at the whole case, it pretty plainly appears—*first*, that the defendants do not intend to carry out one of the terms of the agreement, but insist that, in order to carry on the partnership business, this feature of the agreement must be either disregarded or changed; *second*, that they have refused, in the instances specified, to correspond with the complainants, on matters connected with their business; and, *third*, that the state of feeling between the parties justifies the apprehension, that the business cannot be continued to the mutual advantage of the partners. While, therefore, it may be true, as said by the chancellor, that the defendants have not committed such acts of misconduct, or been guilty of such willful violation of the terms of the contract, as would authorize the court to decree a dissolution *for that cause*; yet we think that the combination of circumstances above enumerated does justify a dissolution in this particular case; which is not one in which there is any joint property, which might be sacrificed by a sale; or where it is probable that a dissolution would inflict material injury on either party; and in which, moreover, it is obvious, from the very nature of the undertaking, that good will, confidence, and concert of effort, (important elements of success in every partnership,) are indispensable to the profitable management of the business.—See 1 Story's Equity, § 673; Collyer on Partn.

§§ 297, 291, 119, and notes; Story on Partn. §§ 275, 289, 290, and notes; *Waters v. Taylor*, 2 Ves. & B. 299; *Baring v. Dix*, 1 Cox, 212; *Bishop v. Breckles*, 1 Hoff. Ch. 534.

[2.] The clause providing for the submission to arbitration of all matters of dispute, has nothing to do with the question, whether equity should decree a dissolution. No mere agreement to refer a controversy to arbitration, can oust the proper courts of their jurisdiction—Collyer on Partn. §§ 250–51, 253, and notes; *Stone v. Dennis*, 3 Por. 231; 1 Story's Eq. § 670.

[3.] As partnerships are founded in personal confidence and *delectus personarum*, it is a settled principle, that no partner, and no majority of partners, can introduce a new member, without the consent of the others. But in this case, after the complainants succeeded to the interests of the persons originally composing the firm of Cox, Brainard & Co., the defendants recognized and treated them as partners, and continued the business, in conjunction with them, under the original agreement. This was quite sufficient to make the complainants partners; and the original articles remained operative, as between them and the defendants. See *Rowland v. Booyer*, 10 Ala. 690; *Cowles v. Garrett*, 30 Ala. 349.

[4.] We do not deem it necessary to add anything to what is said by the chancellor, in support of the proposition. that the agreement constituted a partnership *inter sese*. We cite, however, as sustaining that view, *Champion v. Bostwick*, 18 Wend. 175; and *Pattison v. Blanchard*, 1 Seld. 186.

With these explanations and additions, we approve of and adopt the opinion of the chancellor.

Decree affirmed.