# Mayrant & Company *v.* Marston, Brown & Company.

*Bill in Equity for Settlement of Partnership Accounts.*

1. *Written contract; prior negotiations not contained in, presumed abandoned.* When parties have reduced their contract to writing, all prior negotiations not carried into the writing, are presumed to be abandoned.

2. *Partners inter sese; what constitutes.*—Parties do not become partners *inter sese,* unless there is a stipulation in the agreement for a community of risks, as well as a partition of gains.

3. *Same; particular contract held not to constitute.*—A contract by which two firms agreed to divide equally the profits of their business, after excluding a certain portion of such profits "to cover expenses," stipulating, also, "that the business of their respective firms should be conducted entirely separate," neither being bound to contribute anything to the expenses or losses of the other, does not constitute the two firms partners *inter sese.*

APPEAL from Mobile Chancery Court.

Heard before Hon. H. AUSTILL.

This was a bill filed by Marston, Brown & Co., against Mayrant & Co., and the material averments were that each of said firms were engaged in the business of compressing and shipping cotton in the city of Mobile, each having steam presses in operation, and instead of competing with each other, they entered into an agreement on the 22d of November, 1875, by which it was stipulated, that "each firm" should be "allowed to enjoy, without division, all the benefits derived from bills for shipping charges and compressing on the first fifty thousand bales of cotton compressed, which quantity we consider as requisite to defray the necessary expenses of the business of each firm. On every bale of cotton compressed by either firm over and above fifty thousand bales, the amount derived from bills of shipping charges, and compressing, on said excess of cotton is to be divided equally among our respective firms, after first deducting forty cents per bale for the expense of labor and handling the cotton, settlements to be monthly, say the 15th of each month. The

business of our respective firms to be conducted entirely separate, in all respects, as we have no desire whatever to form any combination detrimental to the interests of others, or objectionable in the eyes of the community. We agree to carry out the above agreement in the utmost good faith until the first day of September, 1876, the agreement to commence on Nov. 22, 1875." Complainants averred that they kept a true account of the cotton compressed and shipping charges earned by them, and prior to July 24, 1876, rendered an account thereof to Mayrant & Co., a copy of which they attached to the bill. On that day they wrote to Mayrant & Co., asking why the latter had declined to furnish an account. This was not answered, but in reply to a second letter from complainants, Mayrant & Co. stated that they would make a statement of their business. This, the bill alleges, they failed to do, and to make monthly or other settlements with complainants, of the net earnings of their business as provided by the agreement; that Mayrant & Co. had compressed and collected shipping charges on sixty-nine thousand bales of cotton; that all over thirty thousand bales was subject to be divided, together with the net earnings on six thousand four hundred and eighty-two bales compressed and handled by complainants according to the agreement; that while the agreement was in force the steam press of R. W. Mayrant "got out of order" and needed repairs, and while the repairs were being made, Mayrant & Co. hired another press to do their compressing, and claim that the cotton so compressed did not come within the agreement; that they cannot state the number of bales compressed by Mayrant & Co., nor the profits made on them, but complainants insisted that Mayrant & Co. were liable to account for the profits on the cotton which had been compressed for them by other presses; that complainants' press had also broken down, and they had hired other presses to work for them, but that they had included this cotton in the statement of the business done under the agreement. The bill then states the number of bales of cotton compressed by Mayrant & Co., and on which they had collected the shipping charges, so far as they could do so—giving the charges for compressing the different classes of cotton, foreign bound or coastwise—and claims that there was a balance of about $3,373.42 due them from Mayrant & Co., which the latter refused to pay.

It is averred that complainants are remediless at law, and that the bill prayed for a discovery of the number of bales of cotton compressed by Mayrant & Co., and what amount they received as compressing and shipping charges thereon; that the register state an account in ac-

cordance with the agreement between complainant and defendant, and all the affairs of such partnership as contemplated by the agreement be closed and settled up. Mayrant & Co. answered the bill, and set up the fact that all persons engaged in the compressing business in Mobile, had entered into an agreement fixing a uniform tariff of charges, permitting, however, any press to carry out any contract previously made without reference to such tariff of charges. The tariff of charges thus fixed, was higher than the specific contracts exempted from its operation; that a short time after this tariff was agreed on, they entered into the agreement with the complainants, which was set out in the bill, and which they aver was based on the tariff of charges, and was not intended to amend or disturb the specific contracts of charges exempt from its provisions. These contracts were not completed when they entered into the agreement with complainants, but were to be completed, and cotton compressed on these contracts was not embraced, or intended to be embraced, under said agreement; that complainants agreed that if defendants' press broke down, they might use one of theirs until Mayrant & Co.'s press could be repaired; that said partnership agreement was never acted on, and was annulled by both parties, in that defendants' press broke down, and they applied to complainants to use one of their presses, which was idle, and complainants refused to allow them to do so; that they then hired other presses to compress for them; that they hired complainants press to compress five thousand eight hundred and ten bales of cotton; that none of this cotton, compressed by hiring presses, was compressed by defendants, within the true meaning of the agreement; that complainants had never furnished any monthly statements to defendants of cotton compressed; that in June, 1876. all the presses worked in combination, selecting some one press, and sending all their cotton to it; each press received the profits of compressing its cotton, and paid a *pro rata* share of the expenses. Defendants compressed most of the cotton compressed, and some of it was compressed for complainants. Defendants claimed that this cotton was not within the agreement; that if the partnership was not dissolved, the complainants ought to bear their share of the loss sustained by defendants, not only on the extra handling of the cotton, which defendant had compressed on hired presses, but also a proper share of their loss in having their press repaired. N. H. Brown, of Marston, Brown & Co., testified that there was no agreement that defendants, Mayrant & Co., could use one of their presses if theirs broke down; that when they made this claim, he referred them to the written agreement, and

that the whole contract between the two firms was contained in this written agreement. To the same effect was the testimony of C. A. Marston, of Marston, Brown & Co., who testified that he offered Robert Middleton, of Mayrant & Co., the use of one of their presses, in case the press of Mayrant & Co. broke down, if the latter would pay one-half the rent. This offer was refused. Robert Middleton testified that the privilege of using this press was the inducement to enter into the contract, and that C. A. Marston made an agreement with him that Mayrant & Co. might use it, and when their press broke down, he applied to Marston, Brown & Co. for it, and was refused; he called on Mr. Brown, and found, to his astonishment, that this stipulation was not included in the agreement. The agreement was drawn up by N. H. Brown, of Marston, Brown & Co., by whom it was signed for this firm, and it was signed by C. L. Huger, for Mayrant & Co. Mr. Huger had no personal knowledge of any agreement as to the use of Marston, Brown & Co.'s press by Mayrant & Co. There was a decree of reference to the register to state the account between the parties, directing him to ascertain how many bales in excess of 50,000 each firm had compressed under the agreement, and charge each firm with the profit realized on such excess, as agreed on in the contract, and, then, after having divided the whole sum between the two firms, to report which firm was indebted to the other, and how much. The register reported that defendants owed complainants $3,795.42, and among the items of charges against Mayrant & Co. he included shipping charges, at 25c. per bale on all the cotton compressed by Mayrant & Co. To this, defendants excepted, on the ground that he should have charged him with only the net profits of the shipping charges. The exception was overruled and a final decree rendered confirming the register's report, which fixed the balance due complainants at $3,795.42, and awarding execution therefor. This decree is assigned as error.

P. HAMILTON, and E. S. DARGAN, for appellants.—While a written contract can not be contradicted or varied by parol testimony, it is universally admitted that it may be read in view of the subject matter and the attendant circumstances, in order to understand more perfectly the meaning and intent of the parties.—1 Gr. Ev. § 277; 101 U. States, 271. Facts and circumstances as to the relation of the parties, the nature, condition, and quality of the property, which constitutes the subject matter of the contract may be proven.—PER SHAW, C. J., 2 Cush. 271.

All the facts and circumstances of the transaction, out

of which the contract arose, may be shown for the purpose of applying the subject matter and removing or explaining any ambiguity.—100 Mass. 63; 101 U. S. 631. So defendants in this case ought not to be held liable for the cotton compressed for them by presses other than their own, nor held to pay the shipping charges on all the cotton compressed by them. The contract was made by parties actually engaged in compressing cotton, and it included only the cotton compressed by them, and not that compressed for them by other parties; indeed, a condition of things arose after the making of the contract, by the breaking down of defendants' press, which was not foreseen, and the consequences of which could not be equitably charged against appellants. The charge of 40 cents per bale was to meet the expense which it was then known to be necessary to meet, and when other expenses became necessary, through the failure of defendants' press, equity should allow it to them. Even when one partner is to bear no share of the losses as between themselves, the contract means "net profits," and the losses are first to be deducted from the gross profits.—Story on Part. §§ 16, 17, 18, 19, 20, 21, 22, 23; 2 Meeson & Welsby, 357. The decree of the Chancellor should have allowed defendants credit for the losses sustained by them for extra expense in having cotton compressed by other presses. They should have credit also for the cost of repairing their press, as well as other losses, before they could be held liable to complainants for any amount.

OVERALL & BESTOR, for appellee. (No brief on file).

STONE, J.—It is contended for appellant that the written contract signed by the two firms, bearing date November 22d, 1875, does not express the whole agreement, but that there was an additional stipulation by Marston, Brown & Co., to allow R. W. Mayrant & Co. to use an idle compress controlled by the former, in the event that the latter broke down, or got out of working order. We think this position untenable, for two reasons: First, the proof fails to convince us there was such agreement; second, where parties reduce their contract to writing, all prior negotiations not carried into the writing, are presumed to be abandoned.— *Winston v. Browning*, 61 Ala. 80; 1 Brick. Dig. 865, §§ 866-7-8.

The agreement, out of which the present controversy grew, does not constitute the two firms partners *inter sese*. Neither firm is to share in any expenses or losses incurred or sustained by the other. To constitute a partnership between themselves, parties must stipulate for a community of risks,

as well as a partition of gains.—*Smith v. Garth*, 32 Ala. 368; *Meaher v. Cox*, 37 Ala. 201. Under the contract in this case, neither contracting party is bound to contribute anything to the expenses or losses of the other. Neither was bound to aid the other in the performance of any work their several patrons might intrust to them. They only agreed to divide equally the profits of their several establishments, after setting apart to each the profits of compressing an agreed number of bales of cotton, to cover the expense of the season's work, and forty cents a bale for all cotton each might compress above that agreed number, to cover expense of handling. So clearly did the parties contemplate keeping their business separate, that they inserted this clause in their agreement: "The business of our respective firms to be conducted entirely separate in all respects." Good faith, and the implications of this contract, required that each firm should exert itself for the promotion of the general interest— that neither should obstruct or embarrass the other in the conduct of its business; but neither was bound to render to the other any active assistance in the performance of any contract, or to supply any machinery for the purpose.

It is objected that the Chancellor should have instructed the register to bring into his account only the net sum of the shipping charges, and not the gross sum. There is a want of evidence in the record to support this objection, even if under the terms of the contract it could be entertained. If there was any expense incurred by the compress company in the matter of shipping the cotton, it is not shown. And the language of the contract seems to include both the shipping and compressing, in the clause which allows forty cents per bale, "for the expense of labor and handling cotton."

We find no error in the record, and the decree of the Chancery Court is affirmed, with damages.