Frerking v. Thomas.

CHRISTOPHER FRERKING, REVIVED IN THE NAME OF FRANK
    W. BARTOS, ADMINISTRATOR, APPELLANT, V. ALBERT
    THOMAS ET AL., APPELLEES.

FILED MARCH 19, 1902.   No. 11,453.

1. **Mortgage:** LAND PRIMARY DEBTOR.  Where land is sold subject to
    a mortgage existing thereon, as between the parties to the
    transaction. the land is the primary debtor, and a sale thereof
    may be resorted to for the satisfaction of the incumbrance.

2. ———: INCIDENT TO DEBT: PURCHASERS OF TITLE IN GOOD FAITH.
    A mortgage on real estate is an incident to the debt evidenced
    by the notes it secures, and passes with an assignment of the
    debt, and an unauthorized release of the mortgage would not
    prevent the enforcement of the rights of the holder of the notes
    to a sale of the property in satisfaction of the debt as to any
    save those who in good faith and without notice have obtained
    title to such property, relying on the record which disclosed
    the apparent satisfaction of the incumbrance.

3. ———: FRAUDULENT ASSIGNMENT: RELEASE.  A grantee of land
    subject to a mortgage thereon fraudulently obtained an as-
    signment of the mortgage and released the same, the notes
    secured thereby being unsatisfied.  *Held*,. as against an indorser
    of the notes, who was compelled to take up the same because
    of his liability as such, that the release was unavailing to de-
    prive him of his lien thereon, and a sale of the property could
    be had to satisfy the debt.

4. **Suit to Reinstate Mortgage:** ALLEGATA.  In a suit to reinstate
    a mortgage on real estate fraudulently released and enforce
    the lien created thereby, it was alleged that after the fraud-
    ulent release of the mortgage the notes secured by the same
    were transferred to a third party, and suit caused to be insti-
    tuted against the payee on his liability as indorser, and that
    he was compelled because of such liability to pay for and take
    up such notes, which he did, giving the amount thereof.  The
    answer alleged that, if any money was paid thereon, it was paid
    to some other and different person, without the knowledge or
    procurement in any manner of the defendants.  *Held*, in the
    face of such an allegation, the defendants could not be heard
    to say and prove that the payment so made was in compromise
    of the plaintiff's liability as indorser, and for their benefit, in
    that it was agreed that no action should thereafter be main-
    tained against the maker of the notes, or to enforce the secur-
    ity pledged to the payment of the debt.

5. **Third Party:** ACTION: DEFENSE: INTENT.  While a third party

may maintain an action or a defense under an agreement be-
tween others made for his benefit, it must appear that there
was an intent by the promisee or person with whom the agree-
ment was made to secure some benefit to such third party, and
also that there existed some privity between the promisee and
the party to be benefited.

6. ———: PURCHASER: KNOWLEDGE: NOTICE. Where a person pur-
chases real estate with knowledge of a third party's equitable
lien thereon, or with notice of such facts as would put an ordi-
narily prudent man on inquiry which, if pursued, would lead to
such knowledge, such person can not be said to be a good-faith
purchaser without notice and entitled to protection as such.

7. Review: DECREE: CONSTRUCTION OF TESTIMONY. In reviewing a
cause on appeal, where the findings and decree of the trial court
can not be reconciled with any reasonable construction of the
testimony, the same will be set aside as unsupported by suffi-
cient evidence.

APPEAL from the district court for Saline county.
Heard below before STUBBS, J. *Reversed.*

*William G. Hastings, Neal & Quackenbush* and *J. A.
Wild,* for appellant.

*A. S. Sands, contra.*

HOLCOMB, J.

Appellant, plaintiff below, brings this case here by. ap-
peal from a finding and decree adverse to him in the trial
court. The action is one in equity, brought to reinstate a
real estate mortgage alleged to have been fraudulently re-
leased, and to enforce a lien on the property described
therein in favor of the plaintiff. The petition is grounded
on alleged fraudulent acts and practices of the defendants
committed to defraud the plaintiff out of his lawful rights.
In substance it alleges that in 1892 the plaintiff, being the
owner of a certain town lot in DeWitt, Saline county,
which is the real estate in controversy, conveyed the same
by warranty deed to defendant, Carrie Chesney, now Carrie
Crane, and that she, to secure the purchase consideration,
executed back to the plaintiff a mortgage thereon, securing
thirteen promissory notes, for the sum of $40 each, the

first payable April 14, 1893, and one maturing every four months thereafter, and drawing interest at ten per cent. per annum from maturity; that thereafter, on September 27, 1894, plaintiff sold and assigned the said notes and mortgage securing the same to one Mary Cobel, the notes being indorsed in blank, and the assignment of the mortgage being duly recorded; that on April 23, 1894, Carrie Chesney, the mortgagor, conveyed the premises to Lelia Chesney, subject to the mortgage, and with the intent to defraud the plaintiff; that on June 26, 1895, Mary Cobel sold the notes and mortgage to defendant, James Chesney, said notes being delivered with a blank assignment of the mortgage, and that this transaction on the part of Chesney was had with the intent to defraud plaintiff; that on July 10, 1895, Lelia Chesney, in collusion with James Chesney and Carrie Chesney to defraud plaintiff, made a release of the mortgage, which release was withheld from the records until after the commission of the acts thereafter complained of; that plaintiff was seventy-eight years old, a German ignorant of English, and incapacitated on account of ill health to do business, and that the Chesneys, by falsely and fraudulently representing that his indorsement of the notes was in full force and effect, and the mortgage unreleased, induced him to pay their agents, attorneys or assigns $396 on said notes, and that suit was caused to be instituted to accomplish such wrongful purpose. It is alleged that the notes have been destroyed; that defendant Thomas, conspiring with the other defendants, and with full knowledge of plaintiff's rights, took a warranty deed of said premises dated December 24, 1897; and that all of the defendants except Thomas are insolvent, and that plaintiff is without remedy except by the enforcement of his rights under said mortgage, and prays for the ascertainment of the amount due him on said notes, and a foreclosure of the mortgage lien, and general equitable relief. The defendants Chesney in their answer deny the fraud charged, or the receipt of any money paid by plaintiff on the notes, and allege that, if any money was paid

thereon, it was paid to some other and different person, and without their knowledge or procurement in any manner. It is also alleged that if any money was paid to obtain his release as indorser it was long after the release of the mortgage, and with knowledge that it had been released, and for the purpose of releasing plaintiff as indorser on the notes, and not in payment of the notes or any part thereof. Defendant Thomas answered separately, denying the alleged fraud, and alleges that he received a warranty deed for the premises, paying $360 therefor, and denies that he had any notice or knowledge of plaintiff's claim; says that he bought the premises in good faith, and without any intention to defraud the plaintiff, and asks to have the title to said premises quieted in him, free of any incumbrance in favor of the plaintiff. The reply denies the allegation of new matter contained in both answers.

The badges and ear-marks of fraud and overreaching are discernible throughout the entire records, so far as the defendants Chesney are concerned; not that any fraudulent act may be directly imputed to the two defendants Carrie and Lelia Chesney, sisters of the defendant James Chesney, for, by the transactions in which their names appear, they are seemingly nominal parties only, the moving spirit and actor in all instances being the brother, who, it appears, being insolvent, carried on and did his business in the name of one or the other of the two sisters made defendants in the action. Whether he was the principal in the several transactions complained of or acted as the agent of his sisters is for the purposes of this case immaterial. In either instance, the legal consequences would be the same, and the plaintiff's rights in nowise changed thereby. It was he that negotiated the purchase of the property, although the deed was taken in the name of his sister, who, in turn, executed the notes and mortgage mentioned in the pleadings to secure the purchase price thereof. He purchased the notes from the transferee, Cobel, and obtained an assignment of the mortgage in blank. He negotiated the sale of the premises to the defendant

Thomas, and we may assume, in the absence of any evidence to the contrary, that he was the principal in all the transactions had, his sisters being only the intermediary for the conveyance of the property, and nominally holding title thereto, while he was in fact the beneficial owner, although it is unnecessary to determine this question. It is disclosed by the evidence that after the procurement of the notes given for the purchase of the lot from the indorsee, Mrs. Cobel, an assignment of the mortgage was obtained, the name of the assignee being left blank and afterwards filled in by inserting the name of his sister, Lelia Chesney, who was then the holder of the legal title to said property. The deed from Carrie to Lelia Chesney bears date April 23, 1894, and was not recorded until February 19, 1897. The assignment of the mortgage in blank from Mrs. Cobel was obtained June 26, 1895. Lelia Chesney, it appears, as assignee of the mortgage, and whose name was afterwards inserted therein, executed a formal release thereof July 10, 1895, the consideration, as given, being the payment of the debt; the release, however, not being recorded until December 31, 1897. Soon after obtaining the notes and mortgage from Mrs. Cobel, June 26, 1895, several of the notes were transferred, evidently by defendant James Chesney, to one Chaloupka, who, it appears, was a creditor of his, although the amount of the indebtedness is uncertain. Chaloupka at once instituted suit on the matured notes against the plaintiff on his indorsement. The notes then past due and unpaid were dishonored, and no notice thereof had been given to plaintiff such as would bind him as an indorser. He was visited by Chaloupka's attorney, and told that he would have to pay the notes sued on, and was liable therefor. No effort appears to have been made to collect of the maker, and no summons was served on her. The plaintiff then procured the assistance of the cashier of a local bank, in which he had a deposit of something over $2,000, to pay whatever was necessary to relieve him from the litigation. Plaintiff's agent visited the county-seat, where the suit was

pending, for that purpose, paid for the notes and they were turned over to him. After returning home, on his statement that they were of no further use, the notes were destroyed. It is altogether clear that the plaintiff did not intend to release any of his rights as the owner of the notes by his purchase of them from Chaloupka, because of his liability as indorser, nor release the property given to secure the debt. The amount paid Chaloupka is uncertain. It is, however, clear that the indorser was not liable for the past-due notes, because no notice of their dishonor had been given him and in the settlement this seems to have been conceded. He was, however, liable for the unmatured paper, of which there were six notes, aggregating $240, and this sum, at least, was no doubt paid in the settlement of the litigation, and to get the notes on which he was liable back into the hands of the plaintiff. It is quite obvious that the attempt under the manipulations of defendant James Chesney to secure the release of the property from the lien created by the mortgage, and at the same time put the notes again in circulation, was for the sole purpose of enforcing payment against the plaintiff as indorser, and thereby deprive him of such security, he being the only responsible party against whom an action would lie for a personal judgment. Whether Chaloupka was a participant in this transaction, having knowledge of the object sought to be accomplished by the person from whom he received the paper, is not altogether clear; nor is it essential to plaintiff's right to relief that such should be the case. His action in immediately undertaking enforcement of payment against plaintiff as indorser, and the after transaction culminating in plaintiff's paying him the amount agreed upon, would indicate that he allowed himself to become a party to the questionable transaction. The property had been transferred by the mortgagor, Carrie Chesney, to Lelia Chesney, subject to the mortgage, and the latter, when she obtained the assignment of the mortgage in the manner she did, could no more deprive the plaintiff of the security pledged to pay the debt than

she could her sister, as maker of the notes, had she been compelled to pay them. As between the parties the land was the primary debtor, and its sale could be required in satisfaction of the incumbrance thereon, and subject to which the grantee, Lelia Chesney, obtained title thereto. *McNaughton v. Burke,* 63 Nebr., 704. The mortgage itself had no independent existence. It was an incident to the debt evidenced by the notes, and passed with their assignment to whomsoever might obtain them with the right to enforce their collection, notwithstanding the attempted release of the mortgage lien; and this right would exist in favor of the holder of the notes, and against every one holding title to the property, save those who in good faith and without notice had obtained title relying on the record disclosing the apparent satisfaction of the incumbrance existing thereon. *Webb v. Hoselton,* 4 Nebr., 308; *Daniels v. Densmore,* 32 Nebr., 40; *Todd v. Cremer,* 36 Nebr., 430; *Whipple v. Fowler,* 41 Nebr., 675; *Mathews v. Jones,* 47 Nebr., 616.

It is, as has been noted, alleged that this settlement was had as a compromise, and for the purpose of releasing the plaintiff as an indorser, and that he did not thereby become the purchaser and owner of the notes with a right to enforce payment by a resort to the mortgage security. It is drawn out on cross-examination of the cashier of the bank that at the time the notes were given up he agreed that it was not "for the purpose of enforcement or of holding against the maker." If, as alleged, this transaction between the agent of plaintiff and the holder of the notes was with third parties, whom the defendants had no relation to, nor connection with, we can not understand why the attempt is made to show that the contract of settlement was made in their interest and for their benefit. If they had nothing to do with the transaction, and were in no way related to it, nor in privity with Chaloupka, it would seem to be an immaterial matter as to them whether in fact, as alleged, the payment was made "for the release of said plaintiff as indorser upon said notes and not in

payment thereof, or any part thereof." Why should
Chaloupka be so greatly concerned about releasing the
maker of the notes or the security given therefor if the
transaction was "entirely without said defendant's knowl-
edge or procurement in any manner"? They no doubt
were aware that if the action thus taken, and the payment
of the defendant's obligation thus obtained, was with their
procurement, knowledge or consent, then it is apparent
that the fraud practiced on the plaintiff would vitiate the
agreement relied on to release them and the property from
further liability; but if, as is alleged, they had no part in
the transaction, nor procured it to be done, then we are
unable to appreciate how the defendants may invoke the
agreement claimed to have been made for the purpose of
relieving the property of the incumbrance which was spe-
cially pledged as a guaranty of the ultimate payment of
the debt. Surely Chaloupka could have enforced the mort-
gage lien had he so desired; and, if so, it is difficult to
understand what tenable objection there is to the plaintiff,
who has succeeded to his rights, from likewise enforcing
the lien. While it is true that an agreement may be made
for the benefit of a third person and enforced by the latter,
though not a party to the consideration (*Morrill v. Skin-
ner,* 57 Nebr., 164, and authorities there cited), the rule
does not, however, extend to entire strangers, who are not
in privity with, nor in anywise related to, the parties to
the transaction so had. Says the supreme court of New
York in *Vrooman v. Turner,* 69 N. Y., 280, 283: "To give
a third party who may derive a benefit from the perform-
ance of the promise, an action, there must be, first, an
intent by the promisee to secure some benefit to the third
party, and second, some privity between the two, the
promisee and the party to be benefited, and some obli-
gation or duty owing from the former to the latter which
would give him a legal or equitable claim to the benefit
of the promise, or an equivalent from him personally."
See, also, *Embler v. Hartford Steam Boiler Ins. Co.,* 158
N. Y., 431, 44 L. R. A., 512; *Klemer v. Sheffield,* 80 N. W.

Rep. [Minn.], 1055.  As to the defendants Chesney, it is difficult to conceive of any theory of the case as presented by the record which would deny to the plaintiff the right to enforce the lien upon the property created expressly for the purpose of securing the payment of the debt.

We assume that the finding of the trial court, and the decree resulting therefrom, arose from conclusions arrived at with respect to the rights of the defendant Thomas, who claims the property free from any lien by virtue of the mortgage, as an innocent purchaser in good faith, and without notice of the equities of the plaintiff therein.  This is practically conceded to be the situation by the appellees, whose counsel say in their brief: "The plaintiffs, in addition to other things which they have failed to prove, have failed to show that the assignment of the property was kept off the records by Thomas, or by any one else at the request or desire of Thomas for the purpose of defrauding the plaintiff in this action.  They have also failed to show that he had any notice whatever of any fraudulent intent on the part of any one or that he in any way participated in any fraud."  It is then argued that the finding of the trial court generally for the defendants is supported by sufficient evidence, and should not, under the rules respecting findings of fact by a trial court, be disturbed on appeal.  We are disposed to think likewise that this question is the only one of a substantial character regarding which there can be any doubt, or cause for hesitancy and investigation in arriving at a correct determination.  If Thomas, as is claimed, is a bona-fide purchaser of the property without notice, whatever may have been the fraud practiced by the other defendants, he would escape its consequences, and hold the property purchased free from the lien sought to be enforced thereon.  Thomas lived in the same town where all the parties resided, which is a small village in Saline county.  He, it is clear, was intimately acquainted with the plaintiff and the other defendants. The transaction by which the plaintiff paid for and obtained the unmatured notes and settled the litigation

began against him occurred in July, 1895. He admits the transaction had created a great deal of talk, and, as he expressed it, was the talk of the town for more than a year before he bought the property. It is also entirely clear that because thereof he was in doubt as to the title he would secure were he to purchase the property. He consulted a lawyer and an abstracter as to the title he was securing, and it is evident that this was not merely a precautionary measure, which is commendable in any intended purchaser, and as a prudent person would ordinarily do, but, rather, in view of the current talk as to the plaintiff having been defrauded out of his property and the security given for its purchase price, would he be safe in purchasing the property because the record title appeared clear, notwithstanding the acts which had transpired and of which he had general knowledge, and as a result of which the plaintiff had apparently lost his security.

Throughout the entire testimony it is disclosed that he relied exclusively on the fact that the records exhibited a clear title, and that he closed his eyes and ears to the many statements brought directly home to him impeaching the title of his grantor because of the fraudulent acts of the defendant James Chesney. Several witnesses testify to statements made to, by, and in the presence of Thomas regarding the state of title to the property before he had purchased, and that he had ample notice so that he might have learned to the minutest detail all the facts surrounding the transactions heretofore spoken of. He does not, only in an indirect way, deny having such notice. He testifies in general terms that he had no knowledge of any fraudulent acts of his grantor or the other defendants. In giving his testimony, after speaking of some inquiries he had made after he had purchased the property, he was asked:

Q. That was the first you knew of anything concerning a claim or interest on the part of Mr. Frerking, was it?

A. Oh, I don't know as I could say that, because that had been a matter of talk for years, I should say; I don't know when it was.

Q. What had been a matter of talk for years?

A. This matter of swindling Frerking out of the property.

Q. Have you in any way aided or assisted in a conspiracy in this matter?

A. No, sir; I will say that I had rented the place before, and Mr. Chesney did not feel like fixing it up for me; the location suited me for my business. The location of the lot was all right, and he told me I had better buy it, and I knew nothing, personally, about the other deals that had been made. I suppose I had heard of them, like any man who has been in DeWitt,—everybody had heard about it.

The abstracter, who was called as a witness for defendant, testified: "I told Mr. Thomas that the deed made by Carrie S. Chesney to Lelia Chesney was made subject to a mortgage of $380, and that there was no such mortgage shown of record; that he had better get a statement from Miss Chesney showing that there was no mortgage of record, or no mortgage recorded; that it might possibly be that the mortgage referred to in that deed was the Frerking mortgage, and with a part unpaid."

Different witnesses for plaintiff testified to conversations with and in the presence of defendant Thomas before he purchased the property, pointing unmistakably to the fact that he was forewarned of the plaintiff's equities in the property. We can not, nor would it serve any useful purpose to set forth *in extenso* the testimony bearing on this point, and must content ourselves with conclusions proper to be drawn therefrom. That the defendant Thomas, at the time of purchasing the property, had direct knowledge of the plaintiff's claim, can hardly be doubted by one reading the record; that he had such notice of the plaintiff's claim as would put an ordinarily prudent man on inquiry, which, if followed up, would lead to actual knowledge of his rights in the premises, is beyond all reasonable doubt; and this is all that is required in order to charge him with such notice as would preclude him from claiming the protection and rights of a good-faith purchaser, who takes the prop-

erty freed from any equities existing against the same, and in reliance on the public records showing a perfect chain of title. *Veeder v. McKinley-Lanning Loan & Trust Co.,* 61 Nebr., 892.

While it is the well-established rule of this court that a finding of fact based on the evidence will not be disturbed unless clearly wrong, the present case, we think, is an exception to the general rule, and in no rational view of the record, construing the testimony as favorably to the defendant as it is fairly susceptible of, can it be said that the evidence will support a finding that the defendant Thomas was a good-faith purchaser of the property without knowledge of plaintiff's rights or notice of facts which would put an ordinarily prudent person on inquiry, which, if followed up, would lead to such knowledge. As between him and the plaintiff, the equities are all in favor of the latter; and Thomas, rather than the plaintiff, should suffer the loss.

From the evidence we are unable to say that plaintiff, in the transaction by which he took up the notes he had formerly indorsed, acquired title to only those which at the time were unmatured, and on which he was liable as indorser, which aggregated $240, and interest from the maturity of each, respectively, and therefore conclude the amount to which he is entitled to a lien, is limited to that sum. The decree of the district court is reversed and the cause is remanded, with directions to the district court to award plaintiff a lien on the mortgaged premises for the principal sum stated, with accruing interest thereon, and directing a sale of the property in satisfaction thereof.

JUDGMENT ACCORDINGLY.