E. H. LUIKART, RECEIVER, APPELLEE, V. MASSACHUSETTS BONDING AND INSURANCE COMPANY, APPELLANT.

FILED OCTOBER 29, 1935. NOS. 29314-29321.

*Kennedy, Holland & De Lacy, Clarence A. Davis* and *Edward J. Svoboda,* for appellant.

*Stiner & Boslaugh, Butler & James, L. R. Stiner* and *F. C. Radke, contra.*

Heard before GOOD, EBERLY, DAY, PAINE and CARTER, JJ., and MESSMORE and RYAN, District Judges.

EBERLY, J.

Eight cases in which E. H. Luikart appears as receiver, plaintiff, and the Massachusetts Bonding and Insurance Company, as defendant, were by stipulation of parties argued and presented to this court as one cause. While the

transactions involved are not identical, they involve facts of similar legal import. All result from a particular course of business observed by Robert Z. Drake, which each transaction in litigation discloses as substantially identical. A careful consideration of the records, the briefs and arguments of the parties impels us to the view that in each case the judgment of the trial court is to be affirmed. The reasons for these conclusions we will proceed to state, with special reference to case No. 29314 for convenience. The language employed applies to each of the other cases, which likewise will be ruled by the conclusions herein stated.

The plaintiff alleges, as his cause of action, ownership by purchase, for a valuable consideration, of a written instrument consisting of four parts, viz.: A certificate, a draft, an acceptance indorsed on the face of the draft, and a bond. The following is a true copy of this instrument, together with indorsements on each part thereof:

The plaintiff alleges nonperformance of the obligations contained in the written instrument, the failure of the defendant to perform the conditions of the bond, the bankruptcy of Drake, the failure to deliver the lumber as required, and the value of the lumber at the time and place of delivery as to which default was made.

The defendant's answer admits substantially the general method of doing business of the parties involved, and admits that it executed, as surety, the bond in suit; but "al-

leges that the certificate contract referred to in said bond was void for lack of mutuality as between Mountain Timber Company and Standard Sesoning Society, and * * * was likewise void for lack of consideration, and that, the certificate being void, the bond was likewise void."

Issues were joined by the plaintiff and a trial to a jury resulted in a directed verdict for the plaintiff. From the order of the district court overruling its motion for judgment on the motion for a new trial, the defendant appeals.

The evidence in the record is to be considered in the light of the following facts:

It appears without dispute that Drake was a bankrupt, duly adjudged as such prior to the institution of this action; that the lumber was never delivered as required by the "certificate;" and that the "trade acceptance" was wholly unpaid.

All of the instrumentalities concerned were largely owned and substantially controlled by Robert Z. Drake. The Standard Bridge Company is merely a trade-name under which Mr. Drake was then carrying on his business of building bridges and selling bridge materials, particularly bridge lumber. Of necessity, Mr. Drake dealt generally with states, counties, or municipalities which had bridges to construct and maintain. The Standard Sesoning Society is also merely a trade-name under which Mr. Drake operated a plant in Oregon for the processing and conditioning of green lumber for the market. He had patented the method of "processing" employed, and the lumber so cured, as is disclosed by the undisputed evidence, was tougher, lighter, and generally better for market than lumber not thus treated. The Mountain Timber Company is a Nebraska corporation of which Mr. Drake was president, chief stockholder, and the owner of practically all of its $1,000,000 bond issue outstanding. It had formerly owned timber lands, and had been engaged in the lumbering and milling business, but for some time prior to the occurrences in suit it had discontinued these operations and restricted its business activities to the purchase and sale of lumber

from various producers thereof. The Sherman Brothers Lumber Company is an Oregon corporation, and was at one time an independent company operating a mill and doing a lumber business on the west coast. Prior to the dates here in question, stock control of this company had been secured by Drake through the agency of the Mountain Timber Company. The moneys employed in the purchase of its stock were furnished by Drake. All the lumber business of Mr. Drake, operating under trade-names—the Mountain Timber Company, and the Sherman Brothers Lumber Company—was carried on pursuant to Mr. Drake's direction, and, it appears, under his unlimited and paramount control.

The evidence adduced in the case now being considered, and which is typical of the other cases now presented to this court, supports the following conclusions as to the facts which constitute the transaction here in suit:  On or prior to June 9, 1931, Geary county, Kansas, contracted with Robert Z. Drake to purchase 24,000 feet of lumber at $37.50 per thousand, to be delivered f. o. b. Junction City, Kansas, by November 11, 1931. The terms of this contract were then transmitted to the Mountain Timber Company, together with necessary funds, and that corporation purchased sufficient green lumber of proper kind and description to fill this Geary county contract.  Upon purchase, this lumber was delivered to the seasoning house at Cottage Grove, Oregon, then operated by Robert Z. Drake as sole proprietor.  It was received, appropriated to the Geary county contract by marks affixed to each piece, and the "processing" commenced.  On that day the instrument denominated "certificate," already herein set forth, signed by Standard Sesoning Society, by Earl Jackson, Manager, was issued and delivered to the Mountain Timber Company.  It also appears that on June 9, 1931, a draft bearing that date, payable on November 11, 1931, in the amount of the Geary county sale, was drawn by the Mountain Timber Company on Sherman Brothers Lumber Company, who also accepted same on the date of issuance.

This draft is denominated a "trade acceptance." It recites: "The obligation of the acceptor of this bill arises out of the purchase of goods from the drawer." These instruments were drawn on a single page blank form, the upper part being, when completed, the "certificate," and the lower part the "trade acceptance;" all of which is shown by the copies in this opinion set out. The completed instrument, together with the acceptance indorsed thereon, was delivered to the Mountain Timber Company. Whereupon on June 20, 1931, the Standard Sesoning Society, by Robert Z. Drake, proprietor, as principal, and the defendant, Massachusetts Bonding and Insurance Company, as surety, executed and delivered the bond in suit to the Mountain Timber Company.

The important recitals and conditions of this bond are as follows:

"Whereas said Principal has entered into a certain written contract of June 9, 1931, that it now holds and will process and deliver lumber order number 9659 f. o. b. cars Junction City, Kansas, by November 11, 1931.

"Now, therefore, the condition of the foregoing obligation is such that if said Principal shall well, truly and faithfully comply with the terms, covenants and conditions of said contract, and shall pay all bills for labor and material required in such case, this bond shall be null and void, otherwise to be and remain in full force and effect."

This bond was thereupon physically attached to the "certificate" and "trade acceptance." The "certificate" and "trade acceptance," each indorsed by the Mountain Timber Company and the Standard Bridge Company, were then sold to the South Omaha State Bank which purchased in reliance upon the face of each instrument, including the bond.

The "trade acceptance" system is not a new scheme or method. In substance it prevails in England, France, and other countries. Such paper in England is known as a "bill." Our bankers usually characterize it as a "draft;" while in Canada it is ordinarily termed a "trade paper."

It existed in the United States prior to the Civil war, and while its use may have been largely eliminated by changing conditions following the Civil war, legally it has never been a stranger to our jurisprudence.

"A trade acceptance is a form of obligation revived in this country in recent years under the regulations of the federal reserve bank board." *Atterbury v. Bank of Washington Heights*, 241 N. Y. 231.

In passing, it may be noted that the federal reserve board has defined the term "trade acceptance" as "a draft or bill of exchange drawn by the seller on the purchaser of goods sold, and accepted by such purchaser." Trade Acceptances, R. H. Treman, p. 21.

"The federal reserve board has defined a 'banker's acceptance' as 'a draft or bill of exchange of which the acceptor is a bank or trust company, or a firm, person, company or corporation engaged in the business of granting bankers' acceptance credits,' arrangement having been made with the bank or other party to 'accept,' thus lending its credit, for which satisfactory security is given and a commission paid. The 'bankers' acceptance' will be used in the handling of commodities, such as grain, cotton, copper, etc., and in other large transactions, but its use in financing ordinary domestic commercial transactions between buyer and seller will be limited and comparatively infrequent as compared with the trade acceptance, and the consideration of its use, therefore, is not attempted here." Trade Acceptances, R. H. Treman, p. 22.

In this connection the custom of merchants, as determined by the federal reserve board rulings, appears to be as follows:

"A draft drawn by a lumber corporation upon a sales corporation which it and a number of other lumber concerns have organized will, when accepted, become a trade acceptance, even though the selling corporation is a stockholder of the sales corporation, provided the latter is organized in good faith and not merely to act as an agent for the purpose of evading the law. (Opinion of Counsel,

Federal Reserve Bulletin, January, 1918, page 33.)" Trade Acceptances, R. H. Treman, p. 66.

Further, "A bill of exchange drawn by the seller of goods and accepted by the purchaser of those goods is a trade acceptance, regardless of whether or not the purchaser intends to resell the goods or to use them for his own purpose. Therefore, a retail dealer may finance the sale of his goods to a retail customer by means of the trade acceptance." Trade Acceptances, R. H. Treman, p. 67.

"Its purpose is to make the book account liquid and permit the seller to raise money on it before it is due under the terms of sale." *Levitt v. Johnstown Office Supply Co.,* 103 Pa. Super. Ct. 76.

In the instant case, we are dealing with an incident arising out of a form of transaction well known to industry, and which public policy evidenced by federal legislation approves. In the present record fraud is neither alleged nor established by the proof.

The appellant challenges the validity of the "certificate" as void for lack of mutuality and lack of consideration, contending that, the "certificate" being void, the bond is void. But the transaction before us amounts to a bailment.

"It is of the very essence of a contract of bailment that it shall contemplate the return of the property bailed, either in the same, or in an altered, form; or its delivery to some third person, with the express or implied consent of the bailor." 6 C. J. 1085.

Here the green lumber received by the Standard Sesoning Society is to be processed, and by the express terms of the certificate is to be delivered "free of all charges by November 11, 1931, f. o. b. Junction City, Kansas, to Mountain Timber Company of Omaha, Nebraska, or their order." This brings the transaction squarely within the definition above quoted. See *Sturm v. Boker,* 150 U. S. 312; *General Motors Acceptance Corporation v. Hupfer,* 113 Neb. 228; *Holcomb & Hoke Mfg. Co. v. N. P. Dodge Co.,* 123 Neb. 142; *Powder Co. v. Burkhardt,* 97 U. S. 110;

*Sattler v. Hallock*, 160 N. Y. 291; *Ferry & Co. v. Forquer*, 61 Mont. 336, 29 A. L. R. 642; *Stewart v. Stone*, 127 N. Y. 500.

"Also, it may be observed that all contracts of bailment, whether the bailee's services are rendered gratuitously, as in the case of a naked bailment and simple deposit, or for hire, are supported by a sufficiently good and legal consideration, which consists in the detriment occasioned to. the bailor by his yielding up the present possession or custody of the article bailed upon the faith of the engagement of the bailee to redeliver." 3 R. C. L. 82, sec. 11. See, also, 6 C. J. 1106; *Magdeburg v. Uihlein*, 53 Wis. 165.

In addition, the undisputed evidence is that the bailee was entitled, by agreement of parties, to receive 5 per cent. of the total amount realized from the sale of the lumber. This proof was admissible, the rule being that, where a written agreement contains no recital of consideration, it is competent to establish the actual or real consideration by parol evidence. See 22 C. J. 1166.

"Even though the instrument does not state any consideration or set forth what the consideration is, parol evidence may be admitted to show that there was a consideration, and of what it consisted." 22 C. J. 1169. See; also, *Horn v. Hansen*, 56 Minn. 43; *Board of Trustees of Seventh Day Baptist Memorial Fund v. Saunders*, 84 Wis. 570; *Goodman v. Smith*, 94 Neb. 227; *Hartman v. Lipovsky*, 122 Neb. 823.

Under the circumstances of this bailment transaction, there being other consideration for the contract, mutuality of obligation was not essential. *Elson & Co. v. Beselin & Son*, 116 Neb. 729; 6 R. C. L. 686, sec. 93; Williston, Contracts, sec. 140.

Therefore, it follows that the contract of bailment was an actual, valid, subsisting contract, and the certificate properly set forth the obligations which its terms imposed upon the bailee.

Having been determined a valid instrument, the bailment contract, as evidenced by the certificate, construed

with the terms of the accepted draft and the bond, in the light of the surrounding circumstances, evidences the intent of all parties that the proceeds of the lumber covered thereby should stand as security to the "Mountain Timber Company of Omaha, Nebraska, or their order," for the amount of the "trade acceptance."

It will be noted that both the accepted draft and the certificate (each physically attached to the bond) were properly indorsed by the Mountain Timber Company at the time of the sale and delivery thereof to the bank now represented by plaintiff. At this time ample consideration was paid therefor by the bank. This constituted, under the circumstances, a valid transfer to the purchasing bank of all the rights vested in the Mountain Timber Company by the terms of the four instruments which, together, then constituted the so-called "trade acceptance." See, *Small v. Smith,* 120 Minn. 118; *Sheldon v. Padgett,* 144 Minn. 141; *Curtis v. Zutavern,* 67 Neb. 183; 5 C. J. 905.

"In the absence of any stipulation or provision in the contract of assignment concerning the securities or other incidents, an unqualified assignment of a chose in action carries with it, as incident to the chose, all securities and liens held by the assignor as collateral to the claim, and all rights incidental thereto. * * * Whatever is necessary to make the assignment effectual will pass as an incident of the thing assigned." 5 C. J. 948.

"It is a general rule that, in the absence of an agreement to the contrary, the assignee for value of a note, bill, judgment, decree or other evidence of indebtedness, for the payment of which the assignor holds collateral security, is in equity entitled, by virtue of the assignment to him of the principal obligation or evidence of indebtedness, to the collateral as such, although not named in the instrument of assignment, and regardless of his knowledge or lack of knowledge of the existence of such collateral." *Edwards v. Bay State Gas Co.,* 184 Fed. 979.

"The assignment of a debt ordinarily carries with it all liens, and every remedy or security that could have been

used, or made available, by the assignor as a means of indemnity or payment, although they are not specifically named in the instrument of assignment, and although the assignment is not by any instrument in writing. In the absence of any provision to the contrary, the unqualified assignment of a chose in action vests in the assignee an equitable title to all such securities and rights as are incidental to the subject-matter of the assignment; and he may enforce them although the assignee at the time was ignorant of their existence." 2 R. C. L. 633, sec. 43. See, also, *Gibson v. Stevens,* 8 How. (U. S.) 383; Williston, Sales (2d ed.) 988; *Heisen v. Smith,* 138 Cal. 216; *National Market Co. v. Maryland Casualty Co.,* 100 Wash. 370; *Frerking v. Thomas,* 64 Neb. 193; Vold, Sales, 330, 333.

The bond in suit includes the following, as part of its recitals: "Whereas said Principal has entered into a certain written contract of June 9, 1931, that it now holds and will process and deliver lumber order number 9659 f. o. b. cars, Junction City, Kansas, by November 11, 1931." This refers to the bailment certificate. One of the conditions set forth in the bond is that the "Principal shall well, truly and faithfully comply with the terms, covenants and conditions of said contract."

"It may be stated generally that, where a bond and another contract or instrument relate to and form one and the same transaction, or the bond refers to such other instrument or is conditioned for the performance of specific agreements set forth therein, such instrument with all its stipulations, limitations, or restrictions becomes a part of the bond, and the two should be read together and construed as a whole. * * * Thus a bond given by a contractor should be construed in connection with the contract or undertaking it is intended to secure." 9 C. J. 36. See, also, *O'Shea v. North American Hotel Co.,* 109 Neb. 317; 28 C. J. 933; *Nye-Schneider-Fowler Co. v. Roeser,* 103 Neb. 614.

"Bonds guaranteeing the contracts of third persons, given by paid surety companies to indemnify the owners of property against loss from the failure of contractors to

perform the conditions of building or other similar contracts, are essentially contracts of insurance, although they may resemble in form contracts of suretyship, since such corporations are in effect insurers, and the strict rules peculiar to contracts of suretyship do not apply in determining their rights and liabilities; rather, the rules of liberal construction and of construction against insurer, if an ambiguity exists, does apply." 5 Couch, Cyclopedia of Insurance Law, p. 4262. See, also, 12 A. L. R. 382, note; *Royal Indemnity Co. v. Northern Ohio Granite & Stone Co.*, 100 Ohio St. 373; *Maryland Casualty Co. v. Fowler*, 31 Fed. (2d) 881; *West v. Detroit Fidelity & Surety Co.*, 118 Neb. 544; 77 A. L. R. 42, note; *Ford Hospital v. Fidelity & Casualty Co.*, 106 Neb. 311; *O'Shea v. North American Hotel Co.*, 109 Neb. 317.

Lord Mansfield early declared: "Every underwriter is presumed to be acquainted with the practice of the trade he insures, and * * * if he does not know it, he ought to inform himself." *Noble v. Kennoway*, 2 Doug. (Eng.) 513, quoted with approval in *Hearne v. Marine Ins. Co.*, 20 Wall. (U. S.) 488. And a court of high standing has added to the principle, thus early declared, that such insurer is presumed to have drawn its contract to cover the needs of the parties. *Park Saddle Horse Co. v. Royal Indemnity Co.*, 81 Mont. 99.

But, construed in the light of the principles of construction announced, the bond fully and completely covers the requirement of the "certificate" that the lumber shall be delivered as specified to the "Mountain Timber Company, of Omaha, Nebraska, or their order." It follows, therefore, that the defendant is liable to the person designated to receive the lumber by the Mountain Timber Company. The sale, indorsement, and delivery by that company of the instruments in suit to the bank is an ample authority entitling it or its representative to enforce the right of action against the defendant for a failure to perform the conditions thereof. *Forburger Stone Co. v. Lion Bonding & Surety Co.*, 103 Neb. 202; *Sailling v. Morrell*, 97 Neb.

454; *Fowler v. Doran,* 123 Neb. 37; *O'Shea v. North American Hotel Co.,* 109 Neb. 317; *Hartford Accident & Indemnity Co. v. Board of Education,* 15 Fed. (2d) 317; *Maryland Casualty Co. v. Fowler,* 31 Fed. (2d) 881; *Ideal Brick Co. v. Gentry,* 191 N. Car. 636; *Daughtry v. Maryland Casualty Co.,* 48 Fed. (2d) 786; *Clinton Bridge Works v. Kingsley,* 188 Ia. 218; *Royal Indemnity Co. v. Northern Ohio Granite & Stone Co.,* 100 Ohio St. 373; *Rentschler v. Missouri P. R. Co.,* 126 Neb. 493.

So, also, if a bond is given to guarantee the performance of a contract, the holder of the bond has an immediate direct cause of action thereon without first exhausting his remedies against the parties liable on the contract. *Home Savings Bank v. Shallenberger,* 95 Neb. 593; 50 C. J. 74; *Klatte v. Franklin State Bank,* 211 Wis. 613; *Federal Surety Co. v. Basin Construction Co.,* 91 Mont. 114.

It thus appears that plaintiff's petition sets forth a proper cause of action which the evidence introduced fully sustains, and which, as to amount of recovery, is amply supported by uncontradicted competent evidence in the record. Therefore, the judgment of the trial court was correct, and it is

AFFIRMED.