Argued January 6, reversed and remanded February 26, 1976

FIRST NATIONAL BANK OF OREGON, *Appellant,*

*v.*

JACK MATHIS GENERAL CONTRACTOR, INC. et al, *Respondents.*

JACK MATHIS GENERAL CONTRACTOR, INC., *Plaintiff-Respondent,*

*v.*

SENIOR CITIZENS LAND AND DEVELOPMENT CO. et al, *Defendants,*

SUTTON, *Defendant-Respondent,*

FIRST NATIONAL BANK OF OREGON, *Appellant.*

546 P2d 754

*Thomas Garrison,* Roseburg, argued the cause and filed briefs for appellant.

*Eldon F. Caley* of Long, Neuner, Dole and Caley, Roseburg, argued the cause for respondent Jack Mathis General Contractor, Inc.

O'CONNELL, C. J.

## O'CONNELL, C. J.

This is a declaratory judgment proceeding in which First National Bank of Oregon seeks a decree declaring that plaintiff is the owner of a judgment against defendant Jack Mathis General Contractor, Inc. through an assignment of the interest of defendant Phil Sutton, the judgment creditor. Plaintiff appeals from a decree in favor of defendants.

The facts are as follows. In 1961, Phil Sutton did business as a plastering contractor in the Roseburg area. The Douglas County State Bank (which later merged with plaintiff) made loans to him from time to time to meet payroll and other job expenses while work was in progress.

In 1961, Mathis subcontracted the plastering work to Sutton in remodeling the Grand Hotel building in Roseburg into a retirement home. During the course of this job, the bank loaned Sutton amounts from time to time which eventually totaled $13,200.00. Jack Mathis General Contractor, Inc. was the general contractor on this remodeling project. While the remodeling was only partially done, the project developed financial difficulties. Claims for work by Sutton, and other subcontractors, were unpaid. On June 29, 1962, Sutton filed a lien for $14,140.34 on an account for his unpaid plastering work. On August 3, 1962, Mathis filed a lien for $52,774.69, as the general contractor.

On August 29, 1962, Mathis filed suit to foreclose the general contractor's lien, joining the owner of the property and all other lien claimants as defendants. On January 25, 1963, the bank took an assignment of all monies due and owing from Mathis to Sutton to secure various loans from the bank to Sutton which had been paid down to $9,941.36, plus interest.[1]

---

[1] This assignment occurred before the effective date of the Uniform Commercial Code in Oregon. Consequently, the secured transactions article of the U.C.C. does not apply to this transaction. Oregon Laws 1961, ch 726, § § 427(2), 428. ORS 71.1030.

Notice of the assignment was sent to and acknowledged by Mathis. On July 29, 1964, after trial in the lien foreclosure proceedings, a decree was entered foreclosing the liens of Mathis and Sutton only, and the property was ordered sold. Sutton's lien was declared valid and prior to that of Mathis. Sutton obtained judgment against the owner of the property and Mathis for $14,140.34, plus interest at the rate of 6% per annum from July 10, 1962, until paid.[2]

The lien foreclosure decree was appealed. While pending on appeal, the case was settled. The property was never judicially sold and was conveyed by A.M.C. Corporation (successor to a prior trust deed security holder) to a Wallace Houston on December 10, 1965. Houston gave Mathis and Sutton a trust deed as security for a purchase price of $45,000.00. There is conflicting testimony as to the extent of the bank's knowledge and participation in the Houston transaction, but it is clear that the bank did not consent to a compromise or settlement of the debt assigned to it by Sutton.

In connection with the Houston transaction, on January 11, 1966 both Sutton and Mathis filed releases of their mechanic's lien of record. However, the Sutton judgment against Mathis was not and has never been satisfied. The evidence indicates that Sutton did not intend to release Mathis from the debt.

Houston defaulted in payment of the price, and Sutton and Mathis acquired title to the property on August 4, 1967, in the trust deed foreclosure. Actually, the conveyence was to their respective attorneys, Paul E. Geddes and Warren A. Woodruff, as trustees for them, under an agreement referred to but not set forth in the deed records. Again, the extent to which the bank was aware of this transaction is in dispute, but

---

[2]Sutton's judgment against Mathis, entered July 29, 1964, was for $14,140.34 plus interest at 6% from July 10, 1962; the "assignment" to the bank of January 25, 1963, was to secure only $9,941.36 plus interest.

there was still no consent by the bank to a compromise or settlement of the debt assigned to it by Sutton.[3]

On January 30, 1967 the bank filed an action against Sutton to obtain a judgment on the promissory notes. The unpaid balance was $9,941.36, plus interest.[4] On August 8, 1967, Sutton filed a petition in bankruptcy. The bank was listed as an unsecured creditor on Schedule A to the bankruptcy petition, although the January 25, 1963 security assignment was mentioned.[5]

The bank appeared at the first meeting of creditors on August 31, 1967, and pointed out that it held an assignment of any monies due from Mathis to Sutton, as security for loans to Sutton. The bankrupt claimed the bank had waived its assignment security when legal action was taken on the notes.

On July 16, 1968 the trustee in the Sutton bankruptcy filed a petition to sell Sutton's interest in the Grand Hotel property to Mathis for $1,500.00. On August 5, 1968 the bank filed a petition in the Sutton bankruptcy proceeding to assert its security interest by virtue of the 1963 assignment. On October 25, 1968 an order was entered in the bankruptcy proceeding requiring Mr. Woodruff and Mr. Geddes to convey their interests, as trustees for Mathis and Sutton, respectively, to the trustee in the Sutton bankruptcy.

---

[3] Absent consent of the bank, the Mathis-Sutton transactions did not affect the bank's right to enforce the assignment. After notice of an assignment, the debtor deals with the assignor at his peril. *See State Farm Mutual Automobile Insurance Co. v. Pohl*, 255 Or 46, 464 P2d 321 (1970).

[4] The last of the series of promissory notes from Sutton to the bank became due and payable on December 15, 1962. These notes were paid down to $9,941.36 on or prior to January 25, 1963. No payments were made after January 25, 1963.

[5] Sutton did not list the judgment against Mathis as an asset in his bankruptcy schedules. The schedules mention only a property interest in the Grand Hotel by virtue of the trust (with Mr. Geddes and Mr. Woodruff as trustees) which had been the result of the foreclosure of the trust deed from Houston. The judgment against Mathis was, however, the subject of testimony and counsel's argument to the Referee in an October 30, 1968 hearing in the bankruptcy proceedings.

On October 8, 1970 a petition was filed by the trustee in the Sutton bankruptcy proceeding to abandon Sutton's interest in the Grand Hotel property. On December 1, 1970 a quitclaim deed from the Sutton bankruptcy trustee was executed, delivered and recorded in favor of Sutton. On December 28, 1970 an order was entered discharging Sutton in bankruptcy. On June 27, 1974 the bank filed the present declaratory judgment proceeding. And on June 28th, 1974 the bank obtained an order renewing the judgment of Sutton against Mathis. Sutton has no further interest in the Grand Hotel property having disposed of any interest in the property to Mathis, who is now the sole owner of the property.

The principal issue is whether plaintiff became owner of Sutton's judgment against Mathis by Sutton's assignment of his rights against Mathis executed on January 25, 1963, which predated the judgment. Defendants raise the further question as to whether the procedure adopted by plaintiff to renew the judgment kept it alive at the expiration of the original ten year life of the judgment. The assignment is as follows:

"ASSIGNMENT
"KNOW ALL MEN BY THESE PRESENTS:
"Whereas, the undersigned PHIL SUTTON has made, executed and delivered promissory notes payable to the DOUGLAS COUNTY STATE BANK of Roseburg, Oregon, on the dates, in the amounts and maturing as follows: [total $13,200.00] which promissory notes bear interest at the rate of eight per cent per annum from date until paid; and

"Whereas, said Phil Sutton desires to furnish said Douglas County State Bank security for the payment of said promissory notes,

"NOW THEREFORE, said Phil Sutton, in consideration of the foregoing which is expressly made a part hereof, and other good and valuable consideration, does hereby assign, transfer and set over unto said Douglas County State Bank, its successors and assigns, all sums

[ 320 ]

which may now be due, owing and payable and which may hereafter become due, owing and payable to said Phil Sutton from Jack Mathis General Contractors, Inc., at any time or times hereafter, in connection with the subcontract of said Phil Sutton with said Jack Mathis General Contractors, Inc., to furnish labor and materials for plastering and other work on the Grand Manor reconstruction project in Roseburg, Douglas County, Oregon, and said Phil Sutton does hereby authorize and direct said Jack Mathis General Contractors, Inc., to pay over to said bank any and all sums which may now be due, owing and payable or which may immediately next hereafter become due, owing or payable under the terms of said plastering subcontract, and said Phil Sutton hereby releases and discharges said Jack Mathis General Contractors, Inc., from any liability to said Phil Sutton on account of any and all monies paid to said bank in accordance herewith, and said Phil Sutton further hereby gives and grants unto said bank full power and authority to demand, receive, receipt for and enforce payment of any sums payable or paid hereunder and to endorse the name of Phil Sutton upon any checks, drafts or other evidence of payment coming into possession of said bank and which are payable to the order of said Phil Sutton under this Assignment."

■  At the time the assignment was executed Sutton had not yet obtained a judgment against Mathis. The initial question is whether the after-acquired judgment inured to plaintiff by force of the previous assignment. Where the judgment is in existence at the time of the assignment the judgment, even though not mentioned in the assignment, passes with it on the theory that the assignment of a debt carries with it the security for the debt. This principal is operative even though the assignee is unaware of the existence of the security.[6]

■  We see no reason for not applying the same principle where the judgment is obtained by the assignor after the assignment. The assignee of the debt has the

[6]Restatement of Contracts § 171(2) (1932); *Tidioute Savings Bank v. Libbey,* 101 Wisc 193, 77 NW 182 (1898); *Luikart v. Massachusetts Bonding & Ins. Co.,* 129 Neb 771, 263 NW 124 (1935).

exclusive right to recover upon it. This is not changed by the assignor's acquisition of a judgment representing the right to recover in a new form. Therefore, whatever interest the assignor acquires as a result of the entry of the judgment must be regarded as inuring to the assignee. As between the assignee, the assignor and other persons including the debtor having notice of the assignment, the pre-existing assignment is operative to transfer the after-acquired judgment to the assignee.[7]

Defendant Mathis argues, however, that even if the judgment is deemed to have passed to plaintiff, it expired on July 29, 1974, ten years after its entry.[8] Defendant contends that the order of renewal obtained by plaintiff was void because the proper procedure for renewal was not followed prior to the expiration of the original ten-year period from the time of the entry of the judgment. The gist of defendant's argument is that "A statutory judgment renewal proceeding is not a new action, but is simply an extension of the original proceeding involving the original parties" and that "for a stranger to the litigation to invoke statutory judgment renewal proceedings, it must have become the record owner of the judgment." The recording of the assignment is necessary, defendant contends, because "only the fulfillment of the official procedural safeguards under ORS 18.400 (2) and (3) [the provisions for recording a satisfaction or assignment of judgments] by which a stranger to the litigation can reliably become the owner of a judgment, should qualify an assignee to invoke statutory powers over the judgment. Otherwise, officers in charge of judgment

[7] *See,* e.g., 2 Freeman on Judgments § 1052, p. 2193 (1925); *Dugas v. Mathews,* 9 Ga 510 (1851).

[8] ORS 18.360 provides: "Whenever, after the entry of a judgment, a period of 10 years shall elapse, the judgment and the lien thereof shall expire. However, before the expiration of 10 years the circuit court in which such judgment was docketed, on motion, may renew such judgment and cause a new entry of the same to be made in the judgment docket, after which entry the lien of the judgment shall continue for another 10 years unless sooner satisfied, and after which entry execution may issue upon such judgment for another 10 years."

[ 322 ]

dockets will be at the mercy of extraneous claims and unauthenticated documents. The courts will be called upon to adjudicate ex parte substantial issues of fact and law."

We do not agree with defendant's interpretation of the statutes, nor do we believe that the renewal of judgments by assignees of non-recorded assignments will produce the evils recited by defendant.

All would agree that an unrecorded assignment of a judgment is effective to transfer the judgment to the assignee. In this respect the unrecorded writing operates to pass the assignor's interest in the judgment as an unrecorded deed operates to pass the grantor's interest in real property. The grantee's failure to record his deed does not preclude him from asserting his rights to the land conveyed unless a bona fide purchaser without notice acquires an interest in the land from the grantor.

The only purpose of a recording statute, whether it relates to the recording of deeds or to the assignment of judgments, is to provide a method by which a transferee can protect himself from intervening claimants. Defendant sees the spectre of "extraneous claims and unauthenticated documents" being presented to the officers in charge of judgment dockets. The officer in charge of recording the assignment of judgments or any other recordable instrument is faced with the like possibility that the transferee has no interest or a defeasible interest in the subject matter of the transfer. In this respect we see no difference between the assignee of a judgment who seeks to record his assignment and the assignee of a judgment who seeks to have it renewed.

Defendant also asserts that the assignee of an unrecorded assignment of a judgment is not a "real party in interest" as defined by ORS 13.030 because "all controversy over the issue of real party in interest will have been foreclosed by entry of the judgment," and

[ 323 ]

that "an ex parte extension of the original proceedings is no place for a stranger to assert unadjudicated equitable rights to the judgment."

■ We do not understand why the entry of the judgment forecloses an assignee from asserting that he is the owner of the judgment and therefore the "real party in interest." If an unrecorded assignment is valid to transfer the judgment, the transferee becomes the real party in interest in enforcing the judgment. Since he is the real party in interest for purposes of realizing upon the judgment, he should be entitled to renew it.

■ The statute setting up the procedure for the renewal of judgments was not intended to make renewal conditioned upon proof by the assignee that he was in fact the owner of the judgment, and therefore the real party in interest. The issue of ownership of the judgment is left for resolution by an adversary proceeding. It may turn out in such a proceeding that the assignee purporting to renew the judgment had no interest in the judgment and that therefore the attempted renewal was ineffective to keep the judgment alive.

■ Defendant further argues that since Sutton owed the bank only $9,941.36, and the judgment was for $14,140.34, there was a partial assignment, which cannot be enforced at law without the consent of the debtor. The fallacy in this argument is that the assignment, although only for the purpose of security, was a transfer of the *whole* interest in the debt and the ensuing judgment for this limited purpose.

■ Defendant contends that plaintiff's claim is barred because the statute of limitations ran on Sutton's indebtedness to plaintiff and that "when the debt is barred by the statute of limitation the creditor's rights to collateral security will be barred by laches." We have held that the running of the statute of limitations on the debt does not affect the remedies of the creditor

[ 324 ]

upon the security.[9] Therefore, plaintiff has a right to realize on the judgment even though its claim against Sutton on the promissory notes is barred. By renewing the judgment, plaintiff had until June 28, 1984 to pursue its remedies against Mathis. The present action asserting its right to the judgment was brought well within the limitation period.

Defendant also contends that the trial court should have declined to hear the merits of the declaratory relief suit because of the possibility that the judgment against Mathis is an unadministered asset of the Sutton bankruptcy estate. Defendant filed a plea in abatement seeking to require plaintiff to petition the bankruptcy court for a re-opening of the Sutton bankruptcy proceedings. It is alleged that defendant would otherwise be subject to conflicting adjudication and claims because payment of the judgment to plaintiff would not preclude a re-opening of the Sutton bankruptcy estate to collect the same judgment as an unadministered asset.

The trial court ruled against defendant on the merits of the plea in abatement, but we need not reach that issue. The plea in abatement was filed on February 5, 1975, almost seven months after defendant's answer was filed on July 9, 1974. Defendant's failure either to raise the matters in abatement before answering or to include the objections in the answer constituted a waiver of the plea in abatement.[10]

Reversed and remanded for the entry of a decree consistent with this opinion.

---

[9] See, Kaiser v. Idleman, 57 Or 224, 108 P 193, 28 LRA(NS) 169 (1910); Myer v. Beal, 5 Or 130 (1873).

[10] See, Fay v. McConnell, 229 Or 128, 131, 366 P2d 327 (1961); Credits Service Co. v. Korn, 121 Or 685, 256 P 1047 (1927)